IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TYLER NILSON, a minor, by          :
KENNETH NILSON and KELLY           :
NILSON, his Guardians and Parents, :
                                   :   CASE NO. 1:06-CV-1474
          Plaintiffs               :
                                   :
     v.                            :
                                   :
HERSHEY ENTERTAINMENT              :   JUDGE SYLVIA H. RAMBO
AND RESORTS COMPANY and            :
GREAT COASTERS                     :
INTERNATIONAL, INC.,               :
                                   :
          Defendants               :

## M E M O R A N D U M

      This is a personal injury action brought by Plaintiffs based on their allegation that Tyler Nilson, a minor, lost hearing in his left ear as a result of riding the Wildcat roller coaster at Hersheypark—an amusement park wholly owned by Defendant Hershey Entertainment and Resorts Company ("HE&R")—on or about August 1, 2003. Before the court are Defendants' Joint Motion for Summary Judgment, (Doc. 62), and Defendant HE&R's separate motion for partial summary judgment, (Doc. 63). Both motions have been fully briefed, and are ripe for disposition. For the reasons that follow, the court will grant Defendants' joint motion for summary judgment, and deny, as moot, Defendant HE&R's separate motion for summary judgment.

## I.    Background

### A.    Facts

#### 1. The Parties

The following facts are undisputed except where noted, and are viewed in the light most favorable to Plaintiff.[1]  Plaintiff Tyler Nilson ("Tyler") is a minor who, at the time of the events relevant to this case, was 11 years old.  Defendant HE&R is the operator of the Wildcat roller coaster and the Hersheypark amusement park.  Defendant Great Coasters International, Inc. ("Great Coasters") is the manufacturer of the Wildcat.

#### 2. Hersheypark Visit

On August 1, 2003, Tyler visited Hersheypark with a friend, Bryan Romeike, Bryan's mother, brother, and a friend of Bryan's brother.  While at Hersheypark, Tyler rode several rides, including the Lightning Racer, another roller coaster.  Tyler rode the Lightning Racer two times.  At first he did not want to ride the Lightning Racer due to his fear of heights, but facing peer pressure he "gave in" and rode it because his friends "kept asking and bugging [him] about it."  (Doc. 77-3, Tyler Nilson Dep. at 59:21-23.)  As he boarded the Lightening Racer, Tyler read the posted signs located at the entrance.

---

[1]In *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148–49 (3d Cir. 2002), the Third Circuit reaffirmed its supervisory rule first announced in *Vadino v. A. Valey Engineers,* 903 F.2d 253, 259 (3d Cir.1990) that "the district courts in this circuit [must] accompany grants of summary judgment hereafter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order." *Vadino*, 903 F.2d at 259.  Here, the court will identify those facts that are subject to a genuine dispute, and cite to the record in order to highlight the precise nature of any disputed facts.  The court will not cite to the record where the facts are undisputed; instead, the court will rely on the statements of material fact and admissions submitted by the parties.  The materiality of any genuinely disputed facts will be analyzed in the discussion section below.

Prior to leaving Hersheypark, Tyler rode on the Wildcat as his last ride for the day. Throughout the day, the other children went on various other roller coasters, but Tyler declined to go on any roller coaster other than the Lightning Racer and the Wildcat. Initially, Tyler did not want to ride the Wildcat because he was scared of heights, and because "it just looked like it was less safe," (Doc. 77-3, Tyler Nilson Dep. 77:25), and he did not want to "fall out" of the ride. (*Id.* at 78:10.) Ultimately, Tyler was convinced by his friends to ride the Wildcat because it was "the last one of the day," (*Id*. at 76:19), and because he did not "want to look like a little wimp not going on it." (*Id.* at 80:7-8.) Before riding the Wildcat, Tyler understood that a roller coaster is "something that goes at high speed as they lift hill [sic] and drops you." (*Id.* at 74:3-4.) While waiting in line for the Wildcat, Tyler read the signs stating that riders should not ride the Wildcat if they suffer from certain health issues and advising riders of "certain speed changes" that occur during the ride. (*Id.* at 81:19 -82.)

Tyler rode the Wildcat and sat with his feet flat on the floor of the car and his back against the seat of the car. He remained in this position throughout the duration of the ride. The Wildcat did not mechanically malfunction during the ride: the safety restraint stayed in place during the entire ride; no part of the ride came loose or struck Tyler; and the ride came to a slow, gradual stop at the end. (Doc. 77-3, Tyler Nilson Dep. 90.-101.) Tyler's head did not make contact with any object during his ride on the Wildcat. (*Id*. at 100-101.) While on the ride, and ascending the first hill, Tyler heard a loud clicking sound that he described as someone screaming in his ear. (*Id*. at 92-93.) After reaching its peak, the ride descended quickly, shaking as it rounded several curves, causing the riders to shake as well. In

his deposition, Tyler described the shaking as "violent . . . like [he] was getting whipped back and forth by the ride." (Doc. 77-3, Tyler Nilson Dep. at 99:8-12.) Tyler testified at his deposition that he would not have ridden the Wildcat if there had been a sign advising him that the ride had "violent shaking." (*Id*. at 121.)

After Tyler exited the ride, he almost immediately realized that he suffered a head ache, although the head ache was not localized in one part of his head. (*Id.* at 104-106.) About a minute or two after he got off the Wildcat, Tyler experienced a ringing in his left ear, but at that point he could still hear. (*Id.* at 106.) The ringing in Tyler's left ear lasted "a couple of hours." (*Id.* at 107:13.) Tyler mentioned his headache and the ringing in his left ear to his friend immediately, and to his friend's mother about 1 hour after going on the Wildcat. The group slept that night in a hotel room, and the ringing in Tyler's ear lasted until he went to sleep. When he awoke the next morning he did not have a headache or ringing in his left ear, but he could not hear from that ear. Tyler has not been able to hear from his left ear since before going to bed the night after he rode the Wildcat.

### 3. <u>Medical Experts</u>

On August 5, 2003, Tyler went to his family doctor because the hearing in his left ear had not returned, the office notes from that visit do not include any mention of Hersheypark, roller coasters, the Wildcat, or any other suspected cause of the hearing loss. (Doc. 65-7, Defs.' Ex. E at 1.) The first mention of the roller coaster in any medical records appears in the office notes from Tyler's visit to Dr. Steven Handler on November 17, 2003—more than three months after Tyler's trip to Hersheypark. (*Id.* at 6.) The tests performed at this visit indicated that Tyler suffered from normal hearing in his right ear, but had nearly complete hearing loss

in his left ear.  A CT scan was performed on December 2, 2003 and was normal.  No follow-up occurred until November 2, 2004, when Tyler was taken to Philadelphia to see Dr. Thomas O. Wilcox, M.D. for a second opinion.

Dr. Wilcox, an otolaryngologist, confirmed that Tyler has almost complete hearing loss in his left ear, and recommended that Tyler have an MRI scan of his brain.  The MRI scan came back normal.  Dr. Wilcox did not see Tyler again until December 27, 2006, at that visit, Dr. Wilcox noted that Tyler's hearing had not improved.  After this litigation commenced, on March 21, 2007, Dr. Wilcox wrote a letter to the attorneys for Plaintiff offering his medical opinion as to the cause of Tyler's hearing loss.  Dr. Wilcox opined:

> It is my impression to a reasonable degree of medical certainty that Tyler Nilson sustained a left sensorineural hearing loss due to cochlear trauma from the roller coaster ride.  I believe that the temporal onset of symptoms, including tinnitus and hearing loss within one-half hour after exiting the ride supports this conclusion.  Although there are no published cases of roller coaster induced hearing loss, there are several publications about roller coaster induced injuries . . . .  It is my impression that intracranial pressure changes due to head trauma during the roller coaster ride were transmitted to the cochlea resulting in intracochlear membrane damage.  The intracochlear membrane damage resulted in the severe-to-profound left sensorineural hearing loss and tinnitus.

(Doc. 77-2, Pls.' Ex. A at 2.)

The parties vigorously dispute whether Tyler suffered any membrane damage.  Although Dr. Wilcox's March 21, 2007 letter mentions that there was membrane damage, Defendants point to Dr. Wilcox's office notes from Tyler's original visit with Dr. Wilcox in November 2004.  The notes read, in relevant part:

"I do suspect that Tyler sustained some inner ear membrane damage because of the head trauma from the roller coaster ride. This resulted in the hearing loss." (Doc. 79-2 at 16.) According to Defendants, those notes indicate that it is "nothing more than a suspicion rather than a demonstrable fact" that Tyler suffered from inner ear membrane damage. (Doc. 79 at 9.) Defendants also point out that none of the diagnostic tests (CT scan or MRI) revealed any inner ear damage. Finally Defendants point to the report of their medical expert, Dr. Robert Sataloff. After examining Tyler, Dr. Sataloff opined:

> In my opinion to a reasonable degree of medical certainty, Tyler Nilson's hearing loss was not causally related to his roller coaster ride. He sustained no head trauma or whiplash injury associated with the ride, and he experienced no dizziness at the time of his alleged hearing loss. . . . [T]he absence of acute dizziness suggests that his hearing loss was not caused by an inner ear membrane break or fistula.

(Doc. 79-2, Defs.' Ex. D at 28.) Dr. Sataloff opined that he could not determine the cause of Tyler's hearing loss without more testing, but the fact that Tyler's hearing loss "occurred after a roller coaster ride does not mean that it occurred because of the roller coaster ride." (*Id.*)

### 4.  <u>Warning Signs</u>

The parties do not dispute that the following signs were displayed at various points to the riders entering the Wildcat, and that Tyler saw these signs before riding:

**THROUGHOUT THE RIDE RIDERS WILL
EXPERIENCE SPEED CHANGES
and UNEXPECTED FORCES.
STRICT ADHERENCE TO THE RULES and
INSTRUCTIONS IS REQUIRED TO
ENHANCE YOUR ENJOYMENT OF THE**

**RIDE and TO AVOID INJURY.**

. . .

**PLEASE
REMAIN SEATED and
KEEP ARMS and LEGS
INSIDE THE RIDE VEHICLE
AT ALL TIMES.**

. . .

**SIT UPRIGHT AND HOLD ON TO THE GRAB BAR**

. . .

**FOR YOUR SAFETY
Please Keep ALL Parts of Your Body
Inside Vehicle at All Times
NO STANDING.**

(Doc. 65-8, Defs.' Ex. F.) Defendant HE&R was in possession of First Aid incident reports indicating the park patrons had complained of headaches and neck pain after riding on the Wildcat, but this information was not communicated on any sign.

### 5. Engineering Experts

The parties retained engineers to opine about the adequacy of the warnings posted on the Wildcat. Plaintiff's expert, George P. Widas, P.E., concluded as follows in his June 25, 2008 report:

> The conditions that produced the subject injury were that Tyler Nilson was not provided with sufficient warning/information related to the character or severity of the forces associated with the Wildcat roller coaster.
>
> . . .
>
> At the time of the conditions that produced the subject injury to Tyler Nilson, there was no warning signage that communicated to a rider how fast the ride traveled, nor what the rider could experience in terms of force or speed during the ride.

. . .

> The subject Wildcat roller coaster was provided to Tyler Nilson with improper, ineffective warnings, without regard for and/or contrary to accepted safe practices, and without regard for and/or contrary to cited, readily available, recognized, accepted, authoritative, applicable reference, standards and codes.

. . .

> Proper and adequate warnings would have specifically identified the hazard for injury by quantifying the character of the speed, motions and forces exerted on the rider by the ride, such as by assigning a severity number to the ride.

(Doc. 77-9, Pls.' Ex. H. at 50-53.)  In a supplemental report dated August 8, 2008, Mr. Widas concluded that the signage at the Wildcat did not provide the necessary words of "caution," "warning," or "danger."  (Doc. 77-11, Pls.' Ex. J. at 2.)  Mr. Widas provided an exemplar sign that would have, in his opinion, appropriately warned Tyler Nilson:

### WARNING!!!

> THIS IS A HIGH SPEED RIDE WITH RAPID JOLTS IN SHARP TURNS AND HARD DIPS.  DO NOT RIDE UNLESS YOU ARE PREPARED FOR THE MOST SEVERE LEVEL OF PHYSICAL IMPACT AND THRILL.

(*Id.*)

Defendants also retained an engineer to offer his expert opinion concerning the adequacy of the warnings on the Wildcat.  Alan Dorris, P.E., Ph.D, offered a contradicting opinion from that of Mr. Widas.  Dr. Dorris concluded, among other things, in his June 23, 2008 report:

> The warning signs posted at the entrance to the Wildcat provide appropriate precautionary information to prospective riders. . . .

8

. . .

> In the materials reviewed to date, I find no indication that Tyler Nilson's condition after riding The Wildcat was related to a known hazard associated with the roller coaster. Absent identification of a hazard, there is nothing to warn of. Without an identified hazard there can be no statement of how to avoid the hazard and no statement of consequences resulting from exposure to the hazard.

(Doc. 65-12, Defs.' Ex. J at 4-5.)

## B. **Procedural History**

Plaintiffs filed their complaint on July 28, 2006, initially only naming HE&R as Defendant. (Doc. 1.) Defendant HE&R filed a motion to dismiss the complaint on September 1, 2006. (Doc. 3.) After being granted leave to do so, Plaintiffs filed an Amended Complaint adding Defendant Great Coasters on December 21, 2006. (Doc. 21.) Defendants each filed motions to dismiss the Amended Complaint, (Docs. 23 & 31), which the court granted in part and denied in part by order dated September 14, 2007, (Doc. 40). The only remaining counts in Plaintiffs Amended Complaint are: (1) Count I for negligence; (2) Count II for product defect/product liability; and (3) Count III for product defect/product liability/failure to warn.

On September 5, 2008, Defendants filed a joint motion for summary judgment as to all remaining counts, along with their brief in support, and statement of material facts. (Docs. 62, 65-66). That same day, Defendant HE&R filed a separate partial motion for summary judgment on Counts II & III of Plaintiff's Amended Complaint, as well as a brief in support. (Docs. 63 & 67.) Plaintiffs filed their briefs in opposition to the respective motions on October 7, 2008. (Docs. 76-

77.)  Reply briefs were filed on October 23, 2008.  (Docs. 78-79.)  Both motions are ripe for disposition.

## II.        <u>Legal Standard</u>

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.* at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted).  Summary judgment should be granted where a party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

Because subject matter jurisdiction in this case is based on diversity of citizenship, the court looks to the substantive law of Pennsylvania to determine the rights and obligations of the parties. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 77 (1938). The law of the Commonwealth is declared by "its Legislature in a statute or by its highest court." *Id*. The Pennsylvania Supreme Court is the best authority on Pennsylvania law, but when the Supreme Court has not issued a clear pronouncement in a particular area, the court "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data" to determine what the law is. *McKenna v. Ortho Pharm. Corp*., 622 F.2d 657, 661, 663 (3d Cir. 1980); *see also Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967). Opinions from lower Pennsylvania courts are not controlling, but they are entitled to significant weight when there is no indication that the Pennsylvania Supreme Court would rule otherwise.

**III.** **Discussion**

    **A.** **Defendants' joint motion for summary judgment**

        **1.** **Issues before the court**

        After the court's September 14, 2007 memorandum and order dismissing counts VI through IX of Plaintiffs Amended Complaint, the only counts remaining in this case are Counts I through III. In Count I, Plaintiffs allege that Defendants were negligent in the use, design, manufacture, assembly, testing, warnings, inspection, and/or distribution of the Wildcat roller coaster; and, that Defendants negligently failed to provide adequate warnings and/or instructions concerning the characteristics and/or dangers of the Wildcat roller coaster. (Doc. 21 at 5-6, Count I ¶¶ 1-3.) In Count II, Plaintiffs allege generally a strict liability defective product claim stating that the Wildcat was "unfit, unsafe, and/or unsuitable for its intended or foreseeable uses and/or was otherwise defective in design, manufacture, distribution, sale, operation and/or warnings." (*Id.* at 7, Count II ¶ 2.) Finally, in Count III, Plaintiffs state a strict liability failure to warn claim and state that Defendants "failed to exercise reasonable care to inform and/or warn expected or foreseeable users of the Wild Cat roller coaster of its dangerous condition or of the facts that made the Wild Cat roller coaster likely to be dangerous." (*Id.* at 9, Count III ¶ 6.)

        Aside from the generalized allegations in the Amended Complaint, Plaintiffs do not allege that the Wildcat malfunctioned in any way. Plaintiffs' engineering expert focuses not on any defect inherent in the Wildcat roller coaster itself, but rather that the ride suffered from inadequate warnings. (*See* Doc. 77-9, Pls.' Ex. H at 50-53; Doc. 77-11, Pls.' Ex. J at 2.) Furthermore, in their statement of

material facts, Defendants stated the following: "The Wildcat did not malfunction in any way during Tyler's ride." (Doc. 66 ¶ 4.) Plaintiffs response was: "Denied. Plaintiffs submit that the Wildcat 'malfunctioned' in that the warnings/signage provided with it were inadequate. Plaintiffs contend that Tyler Nilson would never have even ridden the ride were it not for inadequate warning(s)." (Doc. 74 ¶ 4.) There is simply no evidence in the record suggesting that the Wildcat mechanically malfunctioned in any way during Tyler's ride. In light of this, and Plaintiffs' admission that the only "malfunction" at issue is the alleged failure to warn, the court will grant Defendants' motion for summary judgment as to Count II (product defect/product liability), and that part of Count I (negligence) premised upon anything other than the negligent failure to warn, without further discussion. Plaintiff has simply failed to adduce any evidence on these issues, and judgment will be granted in favor of Defendants.

## 2. <u>Failure to Warn</u>

The crux of the dispute between the parties is whether the warnings provided by Defendants adequately advised riders of the Wildcat of the latent risks associated with riding the roller coaster. If the warnings were adequate, the Wildcat was not defective, and all of Plaintiffs claims fail. If the warnings were inadequate, the court must then analyze whether Tyler would have heeded other warnings, and whether there is sufficient evidence supporting causation. Plaintiffs' theory of the case is that Defendants failed to warn of latent dangers associated with riding the Wildcat roller coaster. Specifically, Plaintiffs assert that the warnings failed to advise Tyler "how violent and fast this ride might be." (Doc. 77 at 6.) Had they done so, according to Plaintiffs, Tyler would have heeded the appropriate warnings,

not ridden the Wildcat, and would still be able to hear from his left ear.  (*Id.*)
Plaintiffs assert that Defendants are liable for their failure to warn under theories of
negligence and strict product liability.

In order to establish a *prima facie* claim for negligence under
Pennsylvania law, Plaintiff must show (1) a duty or obligation, recognized by law,
requiring Defendant to conform to a certain standard of conduct; (2) a failure to
conform to the standard required; (3) a causal connection between the conduct and
the resulting injury; and (4) actual loss or damage resulting to the interests of
another. *Galullo v. Federal Express Corp.*, 937 F. Supp. 392, 394 (E.D. Pa. 1996)
(*citing Morena v. South Hills Health Sys.*, 462 A.2d 680, 684 n. 5 (Pa. 1983)
(internal citations omitted)).

Pennsylvania has adopted § 402A of the Restatement (Second) of Torts
which imposes strict liability in products liability cases.  *See Webb v. Zern*, 220 A.2d
853 (Pa. 1966).  To recover under § 402A, Plaintiff must establish: (1) that the
product was defective; (2) that the defect was a proximate cause of the plaintiff's
injuries; and (3) that the defect causing the injury existed at the time the product left
the seller's hands. *Davis v. Berwind Corp.,* 690 A.2d 186, 190 (Pa. 1997).  In the
context of a failure to warn case, a product is "defective" for strict liability purposes
if it does not have sufficient warnings to notify the ultimate user of the dangers
inherent in the product.  *Id.*  Conversely, if the warning was sufficient, the product is
not defective and the cause of action in strict liability fails as a matter of law.
*Mackowick v. Westinghouse Elec. Corp.*, 575 A.2d 100, 103 (Pa. 1990).

The determination of whether a warning is adequate and whether a
product is defective due to inadequate warnings are questions of law to be answered

14

by the court. *Davis*, 690 A.2d at 190. The adequacy of a warning is evaluated solely on the basis of whether the danger complained of was unobvious and reasonably foreseeable. *See Blake v. Greyhound Lines, Inc.* 448 F. Supp.2d 635, 641 (E.D. Pa. 2006) ("Where a danger is open and obvious, there is no duty to warn.") (*citing Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 119 (3d Cir. 1992); and *Ellis v. Chicago Bridge & Iron Co.*, 545 A.2d 906, 912-13 (no duty to warn of dangers that are not reasonably foreseeable). Whether a danger is open and obvious is an objective inquiry that does not require examination of an individual user's actual knowledge or awareness of the danger. *Fleck*, 981 F.2d at 119 (citations omitted). Rather, this inquiry examines whether an ordinary consumer with knowledge common to the community would have knowledge of the danger. *Id.* (quotations omitted). "If the product is one customarily used by children, the danger must be one which children would be likely to recognize and appreciate in order to prevent them from recovering for a product related injury on the grounds that the danger was open and obvious." *Id.* (*quoting Sherk v. Daisy-Heddon,* 427 A.2d 657, 661 (Pa. Super. Ct. 1981)*, reversed on other grounds,* 498 Pa. 594, 450 A.2d 615 (1982)).

### a.  Adequacy of the warnings

Here, the parties disagree about the nature of the warning that was needed, and Plaintiffs present an inconsistent picture of what it is that they believe to be the latent danger of the Wildcat. In his report, George P. Widas, Plaintiffs' expert, stated that Defendants inadequately warned Tyler about the character or severity of the forces of the ride:

> The conditions that produced the subject injury were that Tyler Nilson was not provided with sufficient warning/information related to the character or severity of the forces associated with the Wildcat roller coaster.
>
> . . .
>
> Proper and adequate warnings would have specifically identified the hazard for injury by quantifying the character of the speed, motions and forces exerted on the rider by the ride, such as by assigning a severity number to ride.

(Doc. 77-9, Pls.' Ex. H at 50-51.)

In response, Defendants argue that "the general danger on which Plaintiffs and their expert have focused—the speed and turbulence of the ride—is both obvious and sufficiently addressed in the existing warning." (Doc. 65 at 14.) In their brief in opposition to Defendants' motion for summary judgment, Plaintiffs ratchet up the nature of the warning that they believe to be necessary, and argue that the warnings on the Wildcat roller coaster were inadequate because they did not caution that riders "would be shaken violently and would be subjected to trauma to their heads and necks," and that the "speed and violent nature of the ride was not so obvious that an inexperienced, first time young rider would know of the ride's violent nature." (Doc. 77 at 14.) In their reply, Defendants argue that since Plaintiffs have "failed to adduce any evidence whatsoever that the ride was unsafe" they cannot argue that the necessary warning would have warned of "violent shaking" and "head trauma." (Doc. 79 at 3.)

After reviewing the evidence in the light most favorable to Plaintiffs, the court finds that the warnings given by Defendants were adequate, and the warning suggested by Plaintiffs' expert would not have prevented the injury. The warnings posted on the ride warned Tyler and other riders that:

**THROUGHOUT THE RIDE RIDERS WILL
EXPERIENCE SPEED CHANGES
and UNEXPECTED FORCES.**

(Doc. 65-8, Defs.' Ex. F.)  Plaintiffs expert opined that this warning was insufficient because it failed to provide "sufficient warning/information related to the character or severity of the forces associated with the Wildcat roller coaster."  (Doc. 77-9, Pls.' Ex. H at 50.)  However, this warning is not so different from the warning suggested by Plaintiffs' expert:

**WARNING!!!**

THIS IS A HIGH SPEED RIDE WITH RAPID JOLTS IN
SHARP TURNS AND HARD DIPS.  DO NOT RIDE
UNLESS YOU ARE PREPARED FOR THE MOST
SEVERE LEVEL OF PHYSICAL IMPACT AND
THRILL.

(Doc. 77-11, Pls.' Ex. J at 4.)  The court fails to appreciate any informative significant difference in Plaintiffs' expert's suggested alternative warning and the warning actually on the Wildcat.  For his part, Mr. Widas—Plaintiffs' expert—stated that the Wildcat's "faded, nearly illegible, vague informational sign . . . did not quantify the character  of the speed, motions or forces exerted on the rider by the ride. . . ." (*Id.*)  The irony is that Plaintiffs' expert's proposed alternative suffers the same flaws.  Nowhere does Mr. Widas' sign quantify the character of the speed—except to state that it is "high," a characterization that needs a benchmark in order for it to have meaning, in other words, "high" as compared to what?—nor does it quantify the motions or forces exerted by the rider.  Quite simply, it is not more—or less—specific than the sign already present, and since the adequacy of a warning is evaluated on the basis of whether a better warning would have prevented

17

the injury, *see Blake v. Greyhound Lines, Inc.*, 448 F. Supp.2d 635 (E.D. Pa. 2006), the court finds that the proposed alternative would not have communicated materially different information such that Tyler would have chosen not to ride the Wildcat. Tyler's deposition testimony supports this conclusion.

Tyler testified at his deposition that he would not have ridden the Wildcat if there had been signs indicating that the ride would cause "violent shaking, or if it could cause something that could happen like happened to me. . . ." (Tyler Nilson Dep. 121:4-5.) Plaintiffs' expert had access to Tyler's deposition, and reviewed it in preparation of his report; nonetheless, Mr. Widas did not opine that an appropriate warning should include any mention of "violent shaking." Instead, he proposed a sign that communicates substantially similar information as the sign already on the Wildcat, a sign that did not deter Tyler from riding.

Moreover, Plaintiffs have failed to demonstrate that the defect complained of—the speed and force exerted by the ride—were unobvious. Here, Defendants are permitted to "assume that users . . . will possess the common knowledge of the community," and they are only required to warn of latent risks. *Fletcher v. Raymond Corp.*, 623 A.2d 845, 848 (Pa. Super. Ct. 1993). The court finds it incredible that anyone—even someone as young as 11—would not know that roller coasters go up and down hills at a fast speed, and that they exert forces on your body. This is obvious to any customer of Hersheypark or any other amusement park. In fact, it was obvious to Tyler. Tyler testified at his deposition that, before riding the Wildcat, he understood a roller coaster to be "something that goes at high speed as they lift hill [sic] and drops you." (Doc.77-3, Tyler Nilson Dep. at 74:3-4.) These observations are sufficient.

The danger complained of by Plaintiffs is not latent in the sense that one must be an expert to appreciate it; after all, this is not a case involving drug side effects, or the foreseeable misuse of a product such as the inhalation of aerosol or butane canisters. Instead, Plaintiffs allege that Defendants should have warned of the excessive speed and force imposed by the Wildcat. Plaintiff's flaw, however, is that they failed to adduce any evidence that the Wildcat imposed excessive speed or force. Plaintiffs do not dispute that at all times the Wildcat met ASTM standards[2], or that the applicable ASTM standards were correct or adequate. Plaintiffs also introduced no evidence suggesting that the Wildcat is an inherently dangerous product. Absent some evidence of this sort, and some evidence that an ordinary patron of Hersheypark would not obviously appreciate that they would get jostled on the Wildcat while going very fast, Plaintiffs have failed to demonstrate that the Wildcat's warning was defective or that Defendants were negligent.

### b. <u>Reasonably foreseeable danger</u>

In their brief in opposition to summary judgment, Plaintiffs try to redefine the Wildcat's danger to conform to the testimony of Tyler that he suffered violent shaking. While it may be true from Tyler's perspective that he suffered "violent shaking," none of the evidence in this case suggests that the Wildcat malfunctioned in any way, or that a warning that the Wildcat subjected riders to potential "violent shaking" or "head trauma" was reasonably foreseeable.

Plaintiffs own expert opined that the inadequacy in Defendants' warning was that it failed to provide Tyler "with sufficient warning/information

_____

[2] ASTM Standards are international technical standards concerning a wide range of products, including amusement rides. They are published by ASTM International.

19

related to the character or severity of the forces associated with the Wildcat roller coaster." (Doc. 64-5 at 50.) Later, in a supplemental report, Plaintiffs' expert suggested an alternative warning that does not suggest that patrons should be warned of violent shaking or head trauma. (*See* Doc. 77-11, Pls.' Ex. J. at 2.) Plaintiffs' counsel's characterization that the inadequacy of the warning was its failure to advise of violent shaking and head trauma finds no support in the evidence, and is an argument that is unsupported even by Plaintiffs' own expert. Presumably, Plaintiff's counsel arrived at the conclusion that the warning should have contained language concerning violent shaking and head trauma because Tyler stated in his deposition that had there been a warning of this sort he would not have ridden the Wildcat. (*See* Doc. 77-3, Tyler Nilson Dep. 121.) While this may have been true for Tyler, there is no evidence to support the conclusion that Defendants had a duty to warn of this danger because it was not reasonably foreseeable.

Plaintiffs' introduced no evidence that the Wildcat subjected riders to dangerous forces. Defendants' expert report cited the Brain Injury Association of America's review of the Correlation between Brain Injury and Roller Coaster Rides, which concluded that the accelerations experienced by roller coaster riders are far below experimentally derived injury thresholds for healthy individuals. (Doc. 65-11, Defs.' Ex. I at 14.) Furthermore, Defendants' expert opined that the Wildcat "meets industry and ASTM standards for acceleration as verified by two separate biodynamic reports." (*Id*.) There is nothing in the record contradicting this evidence. While Plaintiffs generally aver that Defendants were in possession of First Aid Incident Reports indicating that riders of the Wildcat reported suffering from headaches and neck pain, they failed to make these reports available for the

court to allow it to compare the severity of past injuries with the harm that they allege requires a warning. The only evidence of reported injuries from riding the Wildcat came from Jeffrey Budgeon, Defendant HE&R's corporate representative regarding the operation of the Wildcat. Mr. Budgeon testified at his deposition that he was aware, from First-Aid reports, that there were occasional injuries reported. When asked to specify, Mr. Budgeon testified that "[t]here's an occasional complaint of whatever type of injury, be it neck; be it headache; be it I bumped my elbow; be it I stubbed my toe; be it a bug flew in my eye." (Doc. 77-7, Jeffrey Budgeon Dep. at 74:18-21.) While not specific, the court has little trouble concluding that these injuries are not on par with the injuries suffered by Tyler. Plaintiffs have the burden of coming forward with evidence showing that it was reasonably foreseeable that an injury like the one complained of could occur by riding the Wildcat. *See Ellis v. Chicago Bridge & Iron Co.*, 545 A.2d 906, 913 (Pa. Super. Ct. 1988) (holding that a rule of reasonable foreseeability applies to inadequate warning cases, and that there is no duty to warn of dangers that are not reasonably foreseeable). They have not done so.

To the extent that Plaintiffs contend that Defendants had a duty to warn Tyler that he could suffer hearing loss, the court concludes that this too was not a reasonably foreseeable danger. Plaintiffs have adduced no evidence that Defendants knew or could have reasonably foreseen that a person could suffer hearing loss as a result of riding the Wildcat. Plaintiff's own medical expert acknowledges that "there are no published cases of roller coaster induced hearing loss." (Doc. 77-2, Pls. Ex. A at 2.) Furthermore, Defendants' expert's report states that "[t]here have been no reported "loss of hearing" claims on the Hershey Park Wildcat Roller

Coaster since its opening in 1996. Over 9,000,000 guests have ridden the ride since its opening." (Doc. 65-11 at 14.) Plaintiffs refuted none of this evidence. There was simply no basis for Defendants to conclude that they needed to warn about potential hearing loss, violent shaking, or head trauma, and Defendants had no duty to warn of those dangers not reasonably foreseeable. *See Ellis*, 545 A.2d at 913.

### c. **Summary**

The crux of Plaintiffs claims is Defendants alleged failure to properly warn of the latent dangers of the Wildcat. The court concludes as a matter of law that the Wildcat contained sufficient warnings given the information possessed by Defendants and the reasonably foreseeable risks of injury. As such, the Wildcat was not "defective" and Plaintiffs' claims fail as a matter of law. This conclusion applies equally to Plaintiffs' strict liability claims and its claims for negligence. With adequate warnings there was no defect in the Wildcat, thus defeating Plaintiff's product liability claim. Furthermore, because the risk of harm complained of was not reasonably foreseeable to Defendants at the time of the injury, Defendants did not have a duty to warn, and, therefore, cannot have been negligent.

The court does not want to appear dismissive of the injuries suffered by Tyler. A loss of hearing certainly is a significant detriment; however, neither the law of negligence nor the law of products liability imposes absolute liability on Defendants. Absent a duty to warn and inadequate warnings, Defendants cannot be held liable as a matter of law, and the court will grant Defendants' joint motion for summary judgment as to all of the remaining counts.

**B. Defendant HE&R's partial motion for summary judgment**

Because the court will grant Defendants' joint motion for summary judgment disposing of all claims, the court need not address the merits of Defendant HE&R's separate motion for partial summary judgment. That motion will be denied as moot.

**IV. Conclusion**

For the foregoing reasons, the court will grant Defendants' joint motion for summary judgment, (Doc. 62), and will deny as moot Defendant HE&R's motion for partial summary judgment, (Doc. 63). The court will issue an appropriate order.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: August 24, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TYLER NILSON, a minor, by KENNETH NILSON and KELLY NILSON, his Guardians and Parents,** | : | **CASE NO. 1:06-CV-1474** |
| **Plaintiffs** | : | |
| **v.** | : | |
| **HERSHEY ENTERTAINMENT AND RESORTS COMPANY and GREAT COASTERS INTERNATIONAL, INC.,** | : | **JUDGE SYLVIA H. RAMBO** |
| **Defendants** | : | |

## O R D E R

In accordance with the attached memorandum of law, **IT IS HEREBY ORDERED THAT:**

(1)  Defendants' joint motion for summary judgment, (Doc. 62), is **GRANTED**;

(2)  Defendant Hershey Entertainment and Resorts Company's motion for partial summary judgment, (Doc. 63), is **DENIED AS MOOT**;

(3)  The clerk of court shall enter judgment in favor of Defendants and against Plaintiffs on Counts I, II, & III of Plaintiffs' Amended Complaint, all other counts were previously dismissed by order of this court dated September 14, 2007, (Doc. 40), and shall close the case.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  August 24, 2009.